# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAWRENCE GAZDICK         :
        :
         **Plaintiff**     :
      **v.**            :     **3:10-CV-1062**
        :     **(JUDGE MARIANI)**
HILDA SOLIS           :
        :
         **Defendant**    :

## MEMORANDUM OPINION

### I. Introduction

Presently before the Court is Defendant's Motion for Summary Judgment (Doc. 35).

For the reasons that follow, the Court will grant Defendant's motion in part and deny it in

part. Excepting Plaintiff's claim for retaliation in the form of a reduced workload and the

involuntary transfer to the Pottsville field office after he engaged in protected EEOC activity,

Defendant's motion will be granted in all respects. That is, Plaintiff's claim for retaliation in

the forms of denial of relocation benefits and incentives, denials of three positions in Wilkes-

Barre, hostile work environment, and constructive discharge will be dismissed.

### II. Statement of Undisputed Facts

From September 2002 until September 17, 2006, Plaintiff was the Senior Special

Investigator / Staff Assistant, considered the number three job, in the Wilkes-Barre office of

the Mine Safety and Health Administration ("MSHA"). (R. 104-06,[1] Gazdick EEOC

---

[1] When the Court cites to "R. ___," the Court refers to Defendant's pagination to her exhibits in (Doc. 37).

testimony, 14:6-18, 15:8-20, 16:18-23). His supervisors were John Kuzar (District Manager) and William Sparvieri (Assistant District Manager). (R. 106, Gazdick EEOC testimony, 16:10-13).

As Senior Special Investigator, Gazdick's responsibilities included "supervis[ing] any criminal/civil issuances or reviews and investigations and supervis[ing] special investigations in the field office." (R. 107-08, Gazdick EEOC testimony, 17:20-18:10). He also said he was "supposed to be informed of denial of entries, criminal activities at the mines," deal with the solicitor's office, "coordinate all accidents," and "head up the accident investigation group." (R. 127, Gazdick EEOC testimony, 213:12-15; Doc. 43, Ex. A, Gazdick Dep. at 57:10-25).

## Gazdick's Protected EEOC Activity

On April 23, 2004, Gazdick submitted an EEOC affidavit favorable to MSHA in an EEOC matter for another MSHA employee, Robert Dudash. (Gazdick Dep. at 45:2-13). However, on March 4, 2005, when Gazdick was interviewed by MSHA counsel, Brian Mohin and Susan Jordan, he changed his testimony regarding the conduct of Kuzar and Sparvieri toward Robert Dudash to "[n]onfavorable to MSHA." (Id. at 44:16-45:3, 45:22-46:5). Mohin and Jordan informed Gazdick that they would notify Kuzar and Sparvieri that Gazdick was no longer testifying in favor of MSHA. (Id. at 46:2-5). Sparvieri confirmed that Mohin told him that Gazdick would not be testifying in support of MSHA at the Robert Dudash EEOC hearing. (Doc. 43, Ex. O, Sparvieri EEOC testimony, 2/19/09, 305:17-311:22).

2

## Reduction of Responsibilities

According to Gazdick, within "a day or a week" after changing his testimony to "nonfavorable to MSHA," his supervisors began to exclude him from "discussions about interdistrict operations [and] day-to-day business."[2] Gazdick's workload also decreased: he investigated fewer accidents and "eighty percent of the work assigned to" him was eliminated. (Compl. at ¶¶ 21, 25; R. 428, 431, Gazdick Dep. at 65:14-25, 70:1-9).

According to Plaintiff, around April 2005, Kuzar and Sparvieri no longer welcomed his presence and ceased speaking with him. (Gazdick Dep. at 36:3-37:5, 71:8-72:16, 116:11-22; Henry Dep. at 39:3-24).[3] Gazdick was also informed by a "form from personnel that there was a change in [his] status," and he was no longer a supervisor. (Gazdick Dep. at 60:18-62:6). Kuzar concedes that he removed the duty of drafting narratives from Plaintiff, explaining that he did so because Gazdick had poor drafting skills and failed to follow the examples that Kuzar provided to him. The result of Gazdick's allegedly poor work is that Kuzar had to re-do it. (R. 249-250, Kuzar EEOC testimony, 28:19-29:8, 29:13-25).

By April 2005, other duties were removed from Gazdick, including Kuzar's appraisals, discussions on district business, denials of entry, criminal activities at the mines, and dealings with the solicitor's office, which were reassigned to Sparvieri or Jennie Leslie. (Gazdick Dep. at 36:3-37:5, 71:21-72:5; Henry Dep. at 28:7-18. 29:18-30:9, 31:7-32:21,

---

[2] (Gazdick Dep. at 56:18-57:16; 58:22-59:2, 60:18-62:4; Doc. 43, Ex. F, Debra Henry Dep. at 28:7-18. 29:18-30:9, 31:7-32:21, 33:11-17).

[3] Debra Henry's (secretary to Kuzar) testimony was that "Gazdick was subsequently left out of the management loop. I believe Mr. Gazdick, part of his duties were to head up accident investigations. It got to the point Mr. Gazdick wasn't even told about accidents." (Henry Dep., 39:13-17).

33:11-17, 39:3-24). Gazdick was no longer permitted to assign accident investigations or attend training at the academy. (Gazdick Dep. at 67:14-21). According to Gazdick, this was a pattern that Kuzar and Sparvieri perpetuated: they "cut" out those they deemed untrustworthy. (*Id.* at 60:7-17).

Gazdick believes that Kuzar and Sparvieri excluded him from management discussions because of the "Robert Dudash matter and [an ensuing] [Inspector General][4] investigation." (*Id.* at 60:1-6). When Gazdick was asked why he believed his "participation in the Robert Dudash matter caused [him] to be excluded from management discussions[,]" he responded "[p]robably they didn't trust me anymore. I don't know." (*Id.* at 60:7-11). Gazdick's beliefs are based upon Kuzar's and Sparvieri's "demeanor towards" him and timing of events. (*Id.* at 68:24-69:5).

Gazdick was asked "you have no reason to dispute that there were twelve 110c [accident] investigations in 2005 and only five 110c [accident] investigations in 2006; isn't that correct[,]" and he responded "[y]es." (R. 128, Gazdick EEOC testimony, 228:13-18). These duties were a significant portion of his job. (R. 241-42, Kuzar EEOC testimony, 18:6-19:1; R. 298-99, Sparvieri EEOC testimony, 188:21-189:10). Yet, Gazdick never spoke with either Kuzar or Sparvieri regarding his decreased workload. (Gazdick Dep. at 71:8-12; R. 128, Gazdick EEOC testimony, 228:2-5).

---

[4] The Department of Labor's Office of Inspector General's investigators interviewed Gazdick on April 18, 2005 in response to complaints by mine operators "that Kuzar and Sparvieri were being harsh and retaliatory on enforcement" and "MSHA was being publicly critical of [the mine operators] and harassing them through enforcement." (Gazdick Dep. at 29:5-7, 29:24-30:11).

<u>Involuntary Transfer to Pottsville Field Office</u>

After Lester Coleman, the field office supervisor in the Pottsville field office, retired in July 2006, a vacancy announcement was posted for that position. (R. 177, Kuzar EEOC testimony, 363:6-22). Kuzar testified that his ideal candidate was someone who had underground mining and supervisory experience, as well as knowledge of the mines and mine operators in the Pottsville area. For Kuzar, knowledge of the mines and operators was "very important," whereas "some" underground experience was desirable though "not really" important. (R. 177, 182-83, 221-22, Kuzar EEOC testimony, 363:23-25, 369:1-370:19, 411:17-412:25; R. 285-86, see also Sparvieri EEOC testimony, 175:21-176:20).

Five individuals were listed on the certificate for the field office supervisor position in Pottsville: Patrick Boylan, Michael Dudash, Jack McGann, Ronald Pinchorski, and Leonard Sargent. (R. 522, Certificate for Pottsville Field Office Supervisor). Of the five candidates who made the certificate list, some did not possess the experience Kuzar was looking for, many were weak on enforcement/inspections, and some were deemed untrustworthy because they gave advance notice of inspections to mine operators or had previous disciplinary issues.[5] After exhausting the field of available candidates, Kuzar and Sparvieri turned to Gazdick, even though he had not applied for the position. They believed he was

---

[5] (R. 179-81, 183-86, 187, 189-90, 192, 194-96, 198-99 Kuzar EEOC testimony, 366:9-14, 367:18-368:3, 370:20-373:3, 373:16-24, 374:21-24, 376:8-23, 377:11-16, 379:9-23, 381:15-382:14, 383:5-21, 385:9-386:9; R. 275, 283-84, 286-91 Sparvieri EEOC testimony, 155:11-15; 173:4-174:12, 176:21-178:16, 179:15-180:15, 181:1-5).

the best candidate for the position given his prior nine years of experience in the Pottsville field office, including underground and supervisory work.[6]

Previously, Gazdick had worked in the Pottsville field office from 1993 until September 2002. (R. 102-04, Gazdick EEOC testimony, 12:25-14:10; Gazdick Dep. at 18:13-17). While there, Gazdick became familiar with the coal mines and mine operators and also obtained one year of underground experience. (Gazdick Dep. at 18:23-19:4, 26:9-12, 27:9-20).

However, Gazdick was "not happy" with the transfer, because he considered it a demotion, even though his pay scale remained the same. (Compl. at ¶ 28; Gazdick Dep. at 75:15-21, 80:2-9; R. 509-10, Sparvieri's administrative reassignment letter to Gazdick; Doc. 43, Ex. L, Henry EEO testimony, at 102:8-13). The working conditions were difficult because mine pitches were as steep as 90 degrees, requiring him to crawl in dust, dirt, wet, and cold. (Doc. 43, Ex. C, Gazdick EEO testimony, 2/17/09, 94:19-95:10, 96:6-99:10). Gazdick contends that these working conditions caused him to develop severe sinusitis, knee pain, back dislocation, and to suffer a heart attack. (Gazdick Dep. at 86:3-93:5).

Kuzar and Sparvieri chose not to re-assign others (Thomas Garcia and Charles Moore) but selected Gazdick for involuntary transfer instead. Kuzar's rationale for not sending Garcia was that Garcia had "paid his dues" and "was doing a good job," even though he was "[m]ost certainly replaceable." His rationale for not sending Moore was that

---

[6] (R. 102-04, Gazdick EEOC testimony, 12:25-14:10; Gazdick Dep. at 18:13-19:4, 26:9-12, 27:9-20; R. 203, 205-09, Kuzar EEOC testimony, 390:4-13, 392:17-23, 394:9-12, 395:1-9, 395:13-21, 396:17-20; R. 292-93, Sparvieri EEOC testimony, 182:16-183:15).

6

Moore was "mainly a surface fellow." (R. 209-12, Kuzar EEOC testimony, 396:21-398:14, 398:15-399:11; R. 275-76, Sparvieri EEOC testimony, 155:16-156:3; R. 469, Sparvieri Dep. at 90:11-91:1). Gazdick admits that Kuzar, while District 1 manager, administratively reassigned four people in addition to Gazdick. (R. 213-18, Kuzar EEOC testimony, 400:17-405:7).

## Denial of Relocation Expenses and Incentives

The Pottsville field office is more than fifty miles from the Wilkes-Barre District 1 office and sixty miles from Gazdick's home in Swoyersville. (Doc. 43, Ex. C, Gazdick EEO testimony, 2/17/09, 88:5-10, 91:10-12). As a result of his reassignment, Gazdick requested relocation expenses for traveling to his new duty station and relocation incentive pay. (R. 517-18, Gazdick's September 28, 2006 memorandum to Kuzar). However, Kuzar denied Gazdick's request because Gazdick's reassignment was deemed "within the commuting area." (R. 520, Kuzar's October 11, 2006 memorandum to Gazdick). That is, someone else in District 1 purportedly traveled farther for work than Gazdick did, so he was not entitled to relocation expenses. (R. 140-44, 371-72, 375, Leslie EEOC testimony, 79:22-81:1, 82:4-83:8, 354:8-355:16, 371:14-17). Kuzar testified that it would have been his "final decision, with guidance from the people that deal with those issues." (Doc. 43, Ex. G, Kuzar Dep. at 129:13-18).

According to Mary Thornpson-McClay, MSHA HR Specialist Consultant, to receive relocation expenses, an employee must actually relocate because the expenses are for the

costs of moving. (R. 383, 386-88, McClay EEOC testimony, 18:9-10, 21:4-8, 24:9-25:13).
ALJ Gallagher's EEOC opinion noted that Gazdick testified he had never moved from
Swoyersville after his involuntary transfer. (R. 69, Doc. 37, Ex. J, at 9:18-20).

Gazdick stated that "while Mr. Kuzar [was] district manager, [he knew of no] District
One employee who was administratively reassigned from Wilkes-Barre to any District One
field office [who] received relocation compensation." (R. 121, Gazdick EEOC testimony,
203:11-18). He also admitted knowing of no District One employee who was permitted to
travel on government time" or use a government car "when traveling from home to work."
(R. 120-21, Gazdick EEOC testimony, 202:24-203:10).

Kuzar also denied Gazdick relocation incentive pay because the position "was not a
hard to fill position." (R. 520, Kuzar's October 11, 2006 memorandum to Gazdick). The
field office supervisor position was not considered a "hard-to-fill" position[7] because after the
position was advertised, several individuals applied and five made the certificate list. (R.
231-32, Kuzar EEOC testimony, 8:24-9:5, 9:22-10:7). As such, relocation incentive pay was
unnecessary to offer as an incentive to recruit candidates outside the commuting area.
(See R. 385, McClay EEOC testimony, 20:3-6).

### Attempts to Return to Wilkes-Barre District 1 Office

Following Gazdick's reassignment, MSHA announced a vacancy for a Staff Assistant
in the Wilkes-Barre District 1 office. (Compl. at ¶ 44). However, the position was later

---

[7] A position which is advertised but for which no candidates apply. (R. 384, McClay EEOC testimony,
19:7-14; R. 136, Gazdick EEOC testimony, 23:19-22).

8

cancelled. Kuzar hired an inspector instead of a staff assistant because of his staffing needs. (R. 260-61, Kuzar EEOC testimony, 46:15-47:15, 47:23-48:4). Gazdick was asked "you don't have any other facts other than you engaged in EEO activity and your non-selection occurred after your participation in Robert Dudash's hearing to prove retaliation[,]" and he replied,"[c]orrect." (R. 117-18, Gazdick EEOC testimony, 199:25-200:6).

Gazdick alleges that on November 13, 2006, he applied for a Senior Special Investigator position in the Wilkes-Barre District 1 office. (Compl. at ¶ 49). He made the certificate list for the position which was provided to the office on December 21, 2006. (R. 116, Gazdick EEOC Dep. at 198:2-10). Kuzar selected Judy Peters for the position. He testified that he felt Peters was more qualified than Plaintiff because she had more years of experience in the position, had helped to develop the Special Investigator Program, had taught classes on investigatory work at the National Mine Academy, and had excellent communication and computer skills. (R. 252-53, Kuzar EEOC testimony, 37:12-39:6, 39:13-20, 40:4-8). Gazdick was asked "you have no facts other than you engaged in EEO activity and your non-selection occurred after the participation in Mr. Dudash's case to prove retaliation in this non-selection claim; correct[,]" and he replied, "[y]es." (R. 114-15, Gazdick EEOC testimony, 194:5-7, 195:8-14)). Furthermore, Gazdick has "no statements made or written from anyone in MSHA's District One that [his] non-selection was related to the prior EEO activity." (R. 115, Gazdick EEOC testimony, 195:15-20).

In December 2006, MSHA announced a vacancy for a Conference Litigation Representative ("CLR") for the Wilkes-Barre District 1 office. (Compl. at ¶ 53). However, even though Gazdick made the certificate list for the CLR position, Kuzar selected Patrick Boylan for the position instead. (R. 267, Kuzar EEOC testimony, 53:4-8). Kuzar selected Boylan because Boylan had excellent communication and computer skills and had initiative, which were what made him most qualified for the job. (R. 267-68, Kuzar EEOC testimony, 53:4-8, 53:19-54:5). Gazdick was asked, "for the CLR position, you don't have any other facts than that you engaged in EEO activity and your non-selection occurred after your participation in the Robert Dudash hearing to prove retaliation in your non-selection for that position; correct[,]" and he replied, "[c]orrect." (R. 118, Gazdick EEOC testimony, 200:7-15). Gazdick was also asked, "no one in MSHA's District One ever made a statement to you that your non-selection for CLR was related to your prior EEO activity, right[,]" and he replied "[r]ight." (R. 118, Gazdick EEOC testimony, 200:16-21).

Debra Henry, secretary to Kuzar, testified that the process used for those job postings for which Plaintiff applied in Wilkes-Barre was inconsistent with how other job postings had been handled in the past. (Doc. 43, Ex. F, Henry Dep. at 35:1-36:9). Furthermore, she stated that oftentimes, Kuzar would decrease the workloads of those employees who had differences with him. (Id. at 28:2-11). When she had filed a grievance against Kuzar in 2005, however, the dispute went to mediation, and the result was that he increased her workload and gave her an upgraded position. Following the mediation, Kuzar

10

became "a lot more open and receptive," and Henry characterized their relationship as "professional" and stated Kuzar "trusts [her] to some degree." (Id. at 25:12-28:1, 41:8-17). In response to the question: "Is it your information and belief that John Kuzar purposely manipulated those vacancies and notices to exclude Gazdick from corning back to the Wilkes-Barre office?" Henry responded, "I wouldn't have any knowledge of that," but "I personally believe that Mr. Gazdick was not going to be coming back to Wilkes-Barre under any circumstances." (Doc. 43, Ex. L, Henry EEO testimony, 2/18/09, 101:9-102:3). However, Henry admitted she had no direct knowledge of Kuzar treating Gazdick differently because Gazdick engaged in EEOC activity. (Doc. 43, Ex. F, Henry Dep. at 43:9-12).

### Kuzar's Comment to Michael Dudash

In 2003, Kuzar said to Michael Dudash, "people that file EEO complaints and make trouble for the government don't go far with the government. He said I was a young man and I could have a good future with the government, but this EEO and everything I'm doing was dragging me back." (Doc. 43, Ex. B, Michael Dudash EEO testimony, 187:7-16). Kuzar admitted to making this comment. (R. 271, Kuzar EEOC testimony, 59:9-18). Gazdick confirmed that Kuzar had not made that statement to Gazdick, nor had he been present when Kuzar made the statement. (R. 111, Gazdick EEOC testimony, 190:10-22).

## Hostile Work Environment

Gazdick testified that the following conduct by his direct supervisor, Bill Sparvieri, which began after he was reassigned on September 25, 2006 and ended in December 2007, resulted in a hostile work environment:

> (a) Verbally abusing [Gazdick] in an insulting and intimidating manner;
> (b) Chastising and reprimanding [Gazdick] without cause in front of other MSHA employees;
> (c) Scrutinizing [Gazdick's] work more intensely than that of other employees;
> (d) Rating [Gazdick] negatively on his performance evaluations without cause; and
> (e) By engaging in other negative, harassing, demeaning, and retaliatory practices against him.

(Gazdick Dep. at 97:5-98:1, 102:22-25;[8] Compl. ¶ 61). Gazdick described the abuse as:

> Vulgar, violent language. Constantly making accusations of Mike Dudash doing things. And if I explained to him that it was justified, he'd fly off the handle cursing, yelling. Threatening me that if I don't do what he believes should be done, I'll be dealt with. Threatening my job, which ended up in my [2007] appraisal.

(Gazdick Dep. 98:2-12). Gazdick testified that this verbal abuse began when he "was reassigned to the Pottsville field office and [Sparvieri] was my immediate supervisor." (*Id.* at 98:13-17). Even though they were in different locations, Sparvieri in Wilkes-Barre and Gazdick in Pottsville, Gazdick testified that he would communicate with Sparvieri "[s]everal times a day" by phone and e-mail, but "[m]ostly telephone." (*Id.* at 98:18-99:2). Gazdick would see Sparvieri in person in Pottsville "[s]everal times a month," and the secretary,

---

[8] Specifically, Gazdick responded "[n]o" to the question, "[a]re there any other conditions that you were subjected to that aren't listed here?" He also confirmed that Sparvieri was the only one who engaged in the harassing treatment listed above.

Marie Beltz, sometimes heard the conversations between Sparvieri and Gazdick whether they were by phone or in-person. (*Id*. at 99:11-100:7).

Gazdick also claimed that Sparvieri "carr[ied] on that [Gazdick] did this wrong and was supposed to do this and cursing and carrying on" in front of other MSHA employees. (*Id*. at 103:1-15). Finally, Gazdick testified that Sparvieri "nitpick[ed]" his inspections and would single Gazdick out for chastisement. (*Id*. at 103:16-23).

Sparvieri rated Gazdick "minimally satisfactory" for the appraisal period of October 1, 2006 through September 30, 2007. (R. 544-553, Gazdick's performance plan). Gazdick testified that the poor rating from Sparvieri was because of the way Gazdick was supervising Michael Dudash. (Gazdick Dep. at 83:2-6). According to Gazdick, Sparvieri wanted Michael Dudash disciplined because Sparvieri "did not like Michael Dudash" and Michael Dudash filed several EEOC complaints. (*Id*. at 81:17-22, 83:7-84:1).

When Gazdick was asked how the verbal abuse interfered with his work performance, he stated "[i]t didn't put [him] in the right frame of mind to want to even do [his] job." (*Id*. 100:23-101:8). Gazdick conceded that he was still able to perform his job duties despite Sparvieri chastising him in front of other MSHA employees, reprimanding him in front of other MSHA employees, scrutinizing his work more intensely, and giving him a minimally satisfactory performance evaluation. (*Id*. at 105:11-22). Gazdick also conceded that he neither objected to any of the conduct he claims supports his hostile work

13

environment claim nor reported such conduct to anyone at MSHA, but explained it was because it would have been futile to do so. (*Id.* at 100:10-18, 104:1-12).

When Gazdick was asked if "anybody else . . . was subjected to the alleged verbal abuse," or was reprimanded in front of colleagues, he identified Kenneth Hare, Lester Coleman, Blackburn,[9] Dudash, and Pinchorski. (*Id.* at 101:9-14, 104:13-17). Pinchorski, Michael Dudash, Robert Dudash, and Coleman had filed EEOC complaints. (R. 525-27, Proposed Witness List for EEOC Hearing, ¶¶ 8, 9, 11, 12; R. 145, 151, Robert Dudash EEOC testimony, 118:6-10, 156:7-9). Hare did not file an EEOC complaint (R. 159, Hare EEOC testimony, 278:13-22), but he did testify on Plaintiff's behalf in 2009 in Gazdick's EEOC matter.

Gazdick filed his amended EEO complaint on these issues on January 4, 2007. (Doc. 37, Ex. A, at 1). The agency completed its investigation on September 10, 2007. He took sick leave in December 2007 and resigned on May 28, 2008. Following his resignation, Plaintiff attempted to amend his EEO complaint to add a constructive discharge claim (Doc. 37, Ex. C), but ALJ Gallagher denied Plaintiff's motion to amend. (Doc. 37, Ex. H).

---

[9] Plaintiff identified Blackburn as "an acting field office supervisor from Virginia or West Virginia." (Gazdick Dep. at 102:18-21). Plaintiff testified that he did not witness Sparvieri verbally abuse Blackburn, but he would meet with Blackburn "at the academy on several occasions and we would discuss Sparvieri's actions." (*Id.* at 102: 13-17).

## III. **Analysis**

### a. Standard on Motion for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not

present a "genuine issue as to any material fact." FED. R. Civ. P. 56(a). "As to materiality, ...

[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary

judgment bears the burden of showing the absence of a genuine issue as to any material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

Once such a showing has been made, the non-moving party must offer specific facts

contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan*

*v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"Inferences should be drawn in the light most favorable to the non-moving party, and where the

non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as

true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert.*

*denied* 507 U.S. 912 (1993).

### b. Discussion

#### i. Constructive Discharge

Plaintiff filed an amended EEO complaint on January 4, 2007. (Doc. 37, Ex. A, at 1).

He went on sick leave beginning December 2007 and resigned his employment on May 28,

2008. (Compl. ¶¶ 62, 64). Plaintiff's then-counsel orally moved to amend Plaintiff's EEOC

complaint to add a constructive discharge claim, and in an order dated August 27, 2008,

Administrative Law Judge ("ALJ") Laurence Gallagher directed her to file a written motion to

amend within five days of the date of his order. (Doc. 37, Ex. B). Counsel apparently had

requested more than five days within which to file the written motion, but Judge Gallagher

found that five days were sufficient and appropriate. (*Id.* at n.1). Counsel for Plaintiff,

however, did not file the written motion to amend until September 9, 2008. (Doc. 37, Ex. C).

She also attached a motion for extension of time to the motion to amend. (Doc. 37, Ex. D).

Ultimately, ALJ Gallagher denied the motion to amend as untimely. In his

September 23, 2008 written order denying the motion to amend, ALJ Gallagher stated,

> Complainant's counsel had orally moved to add a constructive discharge
> claim based on Complainant's separation in May 2008. Complainant was to
> formally move to add said claim, with a brief proffer as to the theory
> underlying such, within five (5) days of the date of an August 27, 2008 Order.
> Complainant failed to timely do so, . . . Complainant resigned in May 2008.
> He had filed and is litigating discrimination, retaliation, and harassment claims
> well before May 2008, has been represented by counsel throughout this
> entire time, has been placed on notice of his requirements to seek timely
> counseling for employment actions on several occasions, and was noticed of
> time limitations in the Acknowledgment and Order when seeking to amend or
> supplement his claims. This motion was not filed until September 2008,
> despite the fact the undersigned had previously orally granted a previous
> amendment.

(Doc. 37, Ex. H). Therefore, it is undisputed that ALJ Gallagher never reached Plaintiff's

constructive discharge claim, and so, Plaintiff never exhausted his administrative remedies

on the issue of constructive discharge.

On that basis, Defendant seeks summary judgment on Plaintiff's Title VII claim of constructive discharge. Plaintiff, however, argues that the ALJ erred in denying the motion to amend, and his claim for constructive discharge was fairly encompassed within his EEOC complaint such that for all intents and purposes, he did exhaust his administrative remedies.

The Court agrees with Defendant for two reasons. First, following the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, a Plaintiff must administratively exhaust his remedies for each discrete allegedly unlawful employment act before he can bring suit in federal court. 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). Courts outside of this Circuit have found that *Morgan* has changed the analytical landscape for constructive discharge claims. *See, e.g., Malghan v. Evans*, 118 F. App'x 731, 734 (4th Cir. 2004) ("because Malghan's failure to select and [constructive] discharge claims were discrete acts, he cannot salvage them by labeling them part of a hostile work environment claim."); *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) ("*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted.") (internal citation and quotation

marks omitted). The *Martinez* court further said, "In *Morgan*, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been [timely] sought, . . . . The rule is equally applicable, however, to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint." *Id.* at 1210-11 (emphasis in original).

Second, though hostile work environment and constructive discharge claims are related, "[a] hostile work environment will not always support a finding of constructive discharge. To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (internal citations and quotation marks omitted). Therefore, the Court agrees with Defendant that had Plaintiff successfully amended his EEOC complaint to include a claim for constructive discharge, ALJ Gallagher would have had to conduct an analysis different in kind from that for Plaintiff's hostile work environment claim. *See Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) ("To establish a constructive discharge, [a plaintiff] must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.") (internal citations and quotation marks omitted).

Nevertheless, even if the Court were to find that Plaintiff's constructive discharge claim was fairly encompassed within his EEOC complaint, the claim would fail because

Plaintiff has not established a *prima facie* case of hostile work environment. *See supra* Section III.b.iii.

### ii. Retaliation

Before turning to the merits of Plaintiff's claims, the Court will first address a threshold issue pertaining to the parties' respective statements of material fact. To refute many of Defendants' statements of undisputed facts, Plaintiff relies heavily on *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). There, the Supreme Court said, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (internal citations and quotation marks omitted).

Under Plaintiff's argument, the Court cannot consider *any* statements from interested witnesses when evaluating a motion for summary judgment. Taking this argument to its logical conclusion, a court could never consider a defendant's deposition or affidavit because he is an interested party, rendering discovery of a defendant's testimony useless for summary judgment purposes. This takes *Reeves* too far, and this is exactly what the Third Circuit stated in *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) ("[t]he fact is that in considering a motion for summary judgment the court should believe

*uncontradicted* testimony unless it is inherently implausible *even if the testimony is that of an interested witness*.") (emphasis added).

Finally, the Court notes that Plaintiff's interpretation of *Reeves* already has been rejected by another federal district court. The Eastern District of Pennsylvania so held in another case in which the plaintiff was represented by the same counsel as Gazdick is here. *Murphy v. Radnor Twp.*, -- F. Supp. 2d --, 2012 WL 5400084, at *6 (Nov. 6, 2012 E.D. Pa. 2012). After *Murphy*, the undersigned also rejected Plaintiff's argument in *Turner v. Luzerne County*, No. 3:10–CV–814, 2013 WL 791450, at *8 (M.D. Pa. March 4, 2013). Therefore, for those paragraphs in Defendant's statement of undisputed facts which Plaintiff denies by relying solely on *Reeves*, the Court will deem Plaintiff's "denials" as admissions.[10]

Having disposed of this threshold issue, the Court will now address the substance of Defendant's motion and Plaintiff's claims. To establish a *prima facie* case of Title VII retaliation, a plaintiff must show that "(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (internal citation and quotation marks omitted). Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made

---

[10] Therefore, the following paragraphs from Defendant's Statement of Material Facts are deemed admitted: ¶ 27-31, 34-37, 41, 50-78, 81-84, 90-103, 105-06, 108-09, 111, 115, 121-22, 128-130, 133, 135-137, 140-41, 144-148, 150-51, 153, 156, 159-161, 164, 167-169, 171-172, 179-183, 199-200, 204-205, 210-211, 213-214, 216, 218-221, 224-226, 230, 240-241.

an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "With respect to protected activity, the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the participation clause) and those who oppose discrimination made unlawful by Title VII (the opposition clause)." *Moore*, 461 F.3d at 341 (internal citations and quotation marks omitted).

"Once the plaintiff establishes a *prima facie* case, the defendant[s] may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Smith v. City of Allentown*, 589 F.3d 684, 692-93 (3d Cir. 2009) (internal citations and quotation marks omitted). "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (internal citations and quotation marks omitted). "At this stage, the defendant need not prove that the articulated reason actually motivated its conduct." *Id.*

If Defendant articulates a non-discriminatory reason for its actions, Plaintiff

generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to find that discrimination was more likely than not a motivating or determinative cause of termination.

21

*Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id*. at 765.

Defendant concedes for the purposes of her motion that Plaintiff has established a *prima facie* case of retaliation but contends that he cannot show that her proffered legitimate, non-discriminatory reasons for her employment decisions were pretextual. (Doc. 38, at 10-11; Doc. 51, at 16).[11]

### Reduction of Responsibilities

Plaintiff contends that within days of his EEOC activity on behalf of Robert Dudash, Kuzar and Sparvieri reduced his workload considerably. In fact, his workload dropped by almost 80%, some of which is explained by the drop-off of 110c accident investigations from twelve in 2005 to five in 2006. He testified that Kuzar and Sparvieri excluded him from management discussions about interdistrict operations and day-to-day business which began almost immediately after his EEOC activity and continued until his involuntary transfer. Then, around April 2005, Kuzar and Sparvieri no longer welcomed his presence and ceased speaking with him. Gazdick was also informed by a "form from personnel that there was a change in [his] status," and he was no longer a supervisor.

---

[11] Plaintiff also agrees that given Defendant's position, the central issue is what motivated Kuzar and Sparvieri to treat Plaintiff the way they did. (Doc. 46, at 15) ("The only remaining issue is evidence of retaliatory motive).

22

In keeping with this loss of title, other duties were removed from him, including Kuzar's appraisals, discussions on district business, denials of entry, criminal activities at the mines, dealings with the solicitor's office, and those duties were reassigned to Sparvieri or Jennie Leslie. He was no longer permitted to assign accident investigations or attend training at the academy. This was a pattern that Kuzar and Sparvieri carried out; they "cut" those they deemed untrustworthy out.

Kuzar admits that he removed the duty of drafting narratives from Plaintiff, explaining that he did so because Gazdick had poor drafting skills and failed to follow the examples that Kuzar provided to him. The result of Gazdick's allegedly poor work is that Kuzar had to re-do it.[12]

Defendant has conceded that Plaintiff has established a *prima facie* case of retaliation and for the purposes of this motion, concedes that Plaintiff's complained-of reduction of responsibilities occurred. Other than Plaintiff's drafting duties and the drop in 110c accident investigations,[13] Defendant has not offered any explanation for the reduction of Plaintiff's other responsibilities. For instance, Defendant does not explain why Plaintiff was stripped of his title of Supervisor,[14] nor does she give any reason for Plaintiff's

---

[12] The Court will accept Kuzar's statements about Plaintiff's difficulty drafting narratives as undisputed because Plaintiff relied solely on *Reeves* in denying ¶¶ 27-28 of Defendant's Statement of Facts.

[13] Plaintiff concedes that his workload decreased in part because the number of 110c accidents dropped from twelve in 2005 to five in 2006, and these duties were a significant part of his job. The Court characterizes these facts as concessions by Plaintiff because he relied on *Reeves* in his denial to Defendant's Statement of Facts in ¶¶ 29-31 and admitted ¶ 32.

[14] Plaintiff testified that he "was removed as a supervisor." When he was asked whether the reason for his removal as a supervisor was Leonard Rogers's retirement, he responded, "[y]es." (Gazdick Dep. at 62:8-13). This raises a question of the true reason for Plaintiff's loss of supervisory authority, but is not a satisfactory explanation

exclusion from management discussions when he was the "number three" position in Wilkes-Barre. Kuzar and Sparvieri also removed duties from Plaintiff that were subsequently re-assigned to others, and they no longer permitted him to assign accident investigations or attend training at the academy. The Court is satisfied that Plaintiff has shown enough of a reduction in responsibilities for which Defendant has not provided an explanation under *Fuentes*. Therefore, the Court will deny Defendant's motion for summary judgment as to this retaliatory conduct.

### Involuntary Transfer

A vacancy in Pottsville occurred in July 2006 when Lester Coleman retired, and Kuzar and Sparvieri assigned Plaintiff there effective September 25, 2006, even though he never applied for it.[15] Plaintiff argues that Kuzar and Sparvieri should have (1) hired one of the five applicants[16] who made it onto the certificate list or (2) involuntarily transferred someone else to the Pottsville field office supervisor position instead of Plaintiff himself.

Kuzar testified that his ideal candidate was someone who had underground mining and supervisory experience, as well as knowledge of the mines and mine operators in the Pottsville area.[17] Of the five candidates who made the certificate list, some lacked the experience Kuzar was looking for, many were weak on enforcement/inspections, and a few

---

provided by Defendant because the Court does not know the connection (nor the timing) between Mr. Rogers's retirement and Plaintiff's loss of supervisory authority.

[15] Though ¶ 49 of Defendant's Statement of Facts stemmed from Kuzar's EEOC testimony, which Plaintiff has emphatically said the Court cannot consider under *Reeves* because it originates from an interested witness, Plaintiff's response to ¶ 49 was "Agreed." (Doc. 45, ¶ 49).

[16] Those five individuals were: Patrick Boylan, Michael Dudash, Jack McGann, Ronald Pinchorski, and Leonard Sargent.

[17] With the exception of ¶ 49, Plaintiff objected to ¶¶ 50-59 on the basis of *Reeves*. As such, the paragraphs are deemed admitted.

were deemed untrustworthy because they gave advance notice of inspections to mine operators or had previous disciplinary issues. After exhausting the field of interested candidates, Kuzar and Sparvieri turned to Gazdick because they believed he was the best candidate for the position given his prior nine years of experience in the Pottsville field office which included underground and supervisory work. Gazdick also admits that Kuzar, while District 1 manager, administratively reassigned four people in addition to Gazdick.[18]

Kuzar and Sparvieri could have sent other employees to Pottsville, but one (Tom Garcia) was doing a "very good" job in engineering, and the other (Charles Moore) had never worked underground before and was "mainly a surface fellow."

Gazdick's new job duties included field work and regular underground mine inspection, which he had not done in six years. The working conditions were difficult because mine pitches were as steep as 90 degrees, which required him to crawl in dust, dirt, wet, and cold. Plaintiff argues that these working conditions caused him to develop severe sinusitis, knee pain, back dislocation, and to suffer a heart attack. As such, because the working conditions were more adverse than his previous position in Wilkes-Barre and his promotion opportunities were reduced, Gazdick felt that this new position was less prestigious and constituted a demotion.[19] Debra Henry's personal observations about the loss of prestige reinforce Plaintiff's position.

---

[18] Though ¶ 110 of Defendant's Statement of Facts stemmed from Kuzar's EEOC testimony, which Plaintiff has emphatically said the Court cannot consider under *Reeves* because it originates from an interested witness, Plaintiff's response to ¶ 110 was "Agreed." (Doc. 45, ¶ 110).

[19] The Court notes that Plaintiff's pay scale remained unchanged following his transfer.

25

In summary, Kuzar and Sparvieri had a list of attributes they were looking for in a field office supervisor. None of the five applicants who made the list possessed all of those attributes. Kuzar and Sparvieri then identified people who did possess those qualities and decided to transfer Plaintiff involuntarily. In doing so, they also decided not to transfer two others who were purportedly qualified for the job.

Given that the Court has deemed paragraphs 61-78 and 81-84 of Defendant's Statement of Material Facts as admitted by Plaintiff, Defendant has met the "slight burden" of showing legitimate and non-discriminatory reasons for not selecting the five candidates who made the certificate list. The Court finds, however, that there is a question of fact as to whether Kuzar and Sparvieri could have sent either Garcia or Moore to Pottsville and why they instead chose Gazdick: though Garcia "had paid his dues" in his engineering role, he was "most certainly" replaceable, and though Kuzar said it was "very important" for a field office supervisor to be familiar with the mines and mine operators in Pottsville, it is unclear whether Moore had any such experience. On this record, the only reason Moore was not transferred appears to be his lack of underground experience, which Kuzar said was "not really" important. (R. 182, 209-12, Kuzar EEOC testimony, 369:12-20, 396:21-398:14, 398:15-399:11; R. 275-76, Sparvieri EEOC testimony, 155:16-156:3; R. 469, Sparvieri Dep. at 90:11-91:1). Therefore, the Court will deny Defendant summary judgment as to Plaintiff's claim for retaliatory transfer.

## Denial of Relocation Benefits and Relocation Incentives

The Pottsville field office is more than fifty miles from the Wilkes-Barre District 1 office, and sixty miles from Gazdick's home in Swoyersville. Plaintiff cites to 5 C.F.R. § 575.205 for the proposition that he was entitled to relocation benefits.

> (b) An agency may pay a relocation incentive under paragraph (a) of this section when an employee must relocate to accept a position or assignment in a different geographic area. A position is considered to be in a different geographic area if the worksite of the new position is 50 or more miles from the worksite of the position held immediately before the move. If the worksite of the new position is less than 50 miles from the worksite of the position held immediately before the move, but the employee must relocate (i.e., establish a new residence) to accept the position, an authorized agency official may waive the 50–mile requirement and pay the employee a relocation incentive subject to the requirements of this subpart. In all cases, the employee must establish a residence in the new geographic area before the agency may pay a relocation incentive to the employee.

Plaintiff argues that he was entitled to reimbursement for his relocation expenses and relocation incentives when he was transferred to the Pottsville field office, but his requests for such benefits were denied.

Although Plaintiff was denied benefits, he has not shown he was entitled to them. The CFR says that the "agency *may* pay a relocation incentive" if an employee must commute more than fifty miles to the work. However, there is no requirement that the agency pay out such benefits.[20] Therefore, because the agency was not required to provide Plaintiff with relocation benefits, Plaintiff must show that the proffered reason for denying

---

[20] Plaintiff also cites to a document entitled "Changes to Federal Relocation Policy" No. 761 (June 2002) in support of his argument that he was entitled to relocation expenses. (*See* Doc. 43, Ex. H, at 7, ¶ 2). However, the document merely states that "in order to qualify for relocation allowances, the distance between the old duty station and the new duty station must be at least 50 miles or greater." Similar to 5 C.F.R. § 575.205, this document indicates that the agency *may* pay a relocation benefit but does not entitle Plaintiff to one.

him benefits was pretextual. There is no evidence to support Plaintiff's theory that his request for relocation benefits was denied pretextually. Also, to receive relocation expenses from MHSA, an employee must actually relocate because the expenses specifically cover the costs of moving, and it appears that Plaintiff did not move for his position as the Pottsville field office supervisor.[21]

Defendant further asserts that Plaintiff did not receive relocation expenses because he traveled within the commuting area. That is, someone else in District 1 purportedly traveled farther for work than Gazdick did, so he was not entitled to relocation expenses. Kuzar testified that it would have been his "final decision, with guidance from the people that deal with those issues."[22]

Indeed, Defendant points out that Gazdick admitted he knew of no District 1 employee who received relocation compensation after being reassigned within the District 1 area, other than Lenny Rogers (see below). He also admitted knowing of no District One employee who was permitted to travel on government time" or use a government car "when traveling from home to work."

In an attempt to show pretext, Plaintiff argues that Lenny Rogers received relocation expenses in 1993 for the same reassignment from Wilkes-Barre to Pottsville. However, Rogers's case is irrelevant to Plaintiff's situation because neither Kuzar nor Sparvieri were

---

[21] ¶¶ 140-141 are deemed admitted because the sole basis for Plaintiff's denial is *Reeves*.

[22] Leslie testified that she was the final decision-maker, and that is what ALJ Gallagher found as well. However, for the purposes of this motion, the Court will construe the disputed facts in Plaintiff's favor and find that Kuzar had final authority on whether anyone received relocation benefits.

the ones who approved the relocation benefits for Rogers. (Doc. 43, Ex. C, Rogers Travel Authorization, EEO Ex. C-6).[23] For Rogers's situation to have any bearing to Plaintiff's, Plaintiff would have to show that *Kuzar and Sparvieri* treated him worse than other employees because of his protected EEOC activity.

Defendant's proffered reason for denying Plaintiff relocation incentive pay (distinct from relocation benefits discussed above) is that it is used as an incentive to recruit candidates outside the commuting area. Moreover, the field office supervisor position was not considered a "hard-to-fill" position because after the position was advertised, several individuals applied and five made the certificate list. Gazdick's understanding of a hard-to-fill position was that which is advertised but for which no candidates apply. Based on Plaintiff's own understanding, then, *no one* would have been entitled to relocation incentive pay for the Pottsville field office supervisor position given that there were five applicants who made the certificate list and there were three people (including Gazdick) who Kuzar and Sparvieri felt were qualified to fill the position.

Therefore, the Court will grant summary judgment to Defendant on Plaintiff's claim for retaliatory denial of relocation benefits and incentives.

### Decisions not to Transfer Plaintiff back to Wilkes-Barre District One Office

Plaintiff applied for three positions to transfer back to the Wilkes-Barre District 1 office. The first, the Staff Assistant position, was cancelled, purportedly because there was

---

[23] The approving officials were Sandra Stuart and Gordon Reynolds.

insufficient work to justify hiring one. Kuzar hired an inspector instead of a staff assistant because his staffing needs required an inspector rather than a staff assistant. Plaintiff argues the real reason the position was cancelled was that he had achieved the highest score on the certification. (Gazdick Dep. at 96:2-7). However, when Gazdick was asked "you don't have any other facts other than you engaged in EEO activity and your non-selection occurred after your participation in Robert Dudash's hearing to prove retaliation[,]"he replied,"[c]orrect."

The second, the Senior Special Investigator position and Plaintiff's position prior to being transferred to the Pottsville field office, went to Judy Peters. Kuzar testified that he felt Peters was more qualified than Plaintiff (who also made the certificate list) because she had more years of experience in the position, had helped to develop the Special Investigator Program, had taught classes on investigatory work at the National Mine Academy, and had excellent communication and computer skills. Gazdick was asked "you have no facts other than you engaged in EEO activity and your non-selection occurred after the participation in Mr. Dudash's case to prove retaliation in this non-selection claim; correct[,]" and he replied, "[y]es." Furthermore, Gazdick has "no statements made or written from anyone in MSHA's District One that [his] non-selection was related to the prior EEO activity."

The third, the CLR position, went to Patrick Boylan. Kuzar testified that a CLR "represents the district manager" and holds conferences with agency operators. The job also entailed interacting with attorneys and perhaps appearing before a judge and

presenting a case like an attorney would. Therefore, knowledge of mining regulations and good verbal / written communication skills were important. Though Plaintiff made the certificate list, Kuzar selected Boylan because Boylan had excellent communication and computer skills and had initiative, which were what made him most qualified for the job. Plaintiff argues that Kuzar should have considered his thirty-five years of experience testifying in court as a police officer, which Kuzar acknowledges he did not credit. (Gazdick Dep. at 13:22-16:10; Doc. 43, Ex. G, Kuzar Dep. at 153:12-155:10). Gazdick was asked, "for the CLR position, you don't have any other facts than that you engaged in EEO activity and your non-selection occurred after your participation in the Robert Dudash hearing to prove retaliation in your non-selection for that position; correct[,]" and he replied, "[c]orrect." Gazdick was also asked, "no one in MSHA's District One ever made a statement to you that your non-selection for CLR was related to your prior EEO activity, right[,]" and he replied "[r]ight."

As a matter of law, a plaintiff's subjective beliefs about whether he was more qualified than another applicant have no bearing on the employer's hiring decisions. "It is not this court's role to second-guess an employer's business judgment as to who is more qualified for the job." *Sarmiento v. Montclair State Univ.*, 513 F. Supp. 2d 72, 89 (D.N.J. 2007) (citing *Dungee v. Ne. Foods, Inc.*, 940 F. Supp. 682, 689 (D.N.J. 1996)). Rather, "[i]t is the perception of the decisionmaker that is relevant, not the plaintiff's perception of [him]self." *Dungee*, 940 Supp. at 689 (internal citations omitted). "The plaintiff's subjective

31

belief that []he was more qualified for the job does not create an issue of fact for the jury."
*Sarmiento*, 513 F. Supp. 2d at 89 (internal citations omitted).

The Court will not second-guess the qualifications of Judy Peters and Patrick Boylan.
Kuzar and Sparvieri provided several reasons for their beliefs about the superior
qualifications of Peters and Boylan to Plaintiff's. That is, Defendant has provided legitimate
and non-discriminatory reasons for not selecting Plaintiff for the three positions for which he
applied. Based on Plaintiff's admissions in his deposition that he has no evidence of
retaliation other than his original EEOC activity and the timing of the loss of certain job
responsibilities, and his failure to contradict the testimony of Kuzar and Sparvieri, the Court
will grant Defendant's motion as to this claim.

Plaintiff further argues the reasons for not hiring him back to Wilkes-Barre are
pretextual because Sparvieri recommended Pinchorski for the CLR position, even though
Pinchorski had engaged in favoritism with the mine operators, and the CLR position
required one to be more trustworthy than a field office supervisor. (Doc. 43, Ex. O, Sparvieri
EEO testimony, 201:10-203:1).[24]  Perhaps this would cast doubt on the explanations offered
by Defendant if Pinchorski *had* been selected for the CLR position, but he was not.
Sparvieri's recommendation notwithstanding, Kuzar selected someone whose
trustworthiness Plaintiff does not impugn.

---

[24] Despite his reliance on *Reeves*, Plaintiff asks this Court to accept this statement from Sparvieri, an
interested witness, as true.

Plaintiff also points to the deposition testimony of Debra Henry, secretary to Kuzar in an attempt to show pretext. She testified that the process used for those job postings for which Plaintiff applied were inconsistent with how other job postings had been handled in the past, though she did not identify which, if any, MSHA policies were violated by these "inconsistent" postings. Though she stated that oftentimes, Kuzar would decrease the workloads of those employees who had differences with him, she also admitted that when she herself filed a grievance against Kuzar, her dispute went to mediation and ultimately, he increased her workload and upgraded her position. Following their mediation, he became more open and receptive, and their relationship improved to a professional level. Finally, she stated that though she "wouldn't have any knowledge of" whether Kuzar intentionally manipulated vacancies and notices to exclude Plaintiff from returning to Wilkes-Barre, she "personally believe[d] that Mr. Gazdick was not going to be coming back to Wilkes-Barre under any circumstances." Henry also admitted she had no direct knowledge of Kuzar treating Gazdick differently because Gazdick engaged in EEOC activity. At most, Henry's observational testimony shows that Kuzar and Sparvieri may have disliked Plaintiff, but her testimony does not link their behavior to Plaintiff's EEOC activity, nor does it show that their stated reasons for hiring others for positions in Wilkes-Barre were pretextual.

### Kuzar's 2003 Comment to Michael Dudash

Sometime in 2003, Kuzar told Michael Dudash, ". . . people that file EEO complaints and make trouble for the government don't go far with the government." Kuzar also told

33

Michael Dudash he "was a young man and [he] could have a good future with the government, but this EEO and everything . . . was dragging [him] back." Kuzar admits to having made this comment.[25]

"Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) (finding that a partner's comment that the job would not be easy for Ezold because she was a woman who had neither attended an Ivy League law school nor been on law review "before Ezold began her employment at Wolf, five years before the . . . decision," to deny her a partnership was "too remote and isolated" to prove sex discrimination). Nevertheless, "such remarks could provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 368 (3d Cir. 2008).

It is undisputed that Kuzar was a decision-maker and took part in, at least, Plaintiff's involuntary transfer. Defendant argues that Kuzar's statement that "most EEOs don't go anywhere" was too remote in time and context to show evidence of discrimination towards Plaintiff. Plaintiff responds by arguing that Kuzar's statement is evidence of bias or hostility towards employees who participate in the EEO process, citing *C.A.R.S.* Plaintiff's reliance

---

[25] "[A]t least five and a half years ago . . . the statement I made at the time was most EEOs don't go anywhere . . . And that was a stupid thing. . . . It was not professional on my part." (R. 271, Kuzar EEOC testimony, 59:9-18).

on *C.A.R.S.* is misplaced because the case ultimately favors Defendant's position. In

*C.A.R.S.*, the plaintiff had aborted a fetus, and she claimed she was terminated as a result.

One witness stated that she overheard a co-worker comment to the plaintiff's supervisor, "'I

don't know what all this secrecy behind [the plaintiff] losing her baby was.' And Mr. Kohl

said 'she didn't want to take responsibility.' Which upset me." *C.A.R.S.*, 527 F.3d at 368.

The plaintiff was fired within a week of having her abortion. The facts of this case fall far

short of those in *C.A.R.S.*

Kuzar's statement to *Michael* Dudash[26] was made sometime in 2003. Gazdick

participated in *Robert* Dudash's matter in March 2005. (Gazdick Dep. 45:2-13). The

statement was not directed at Gazdick, about him, or related to any employment decision

that affected him. Furthermore, at the time of Kuzar's statement, Gazdick had not engaged

in any protected EEO activity. Therefore, the Court finds that Kuzar's statement was a stray

remark that does not show pretext on the part of either Kuzar or Sparvieri. *See Keller v.*

*Orix Credit Alliance*, 130 F.3d 1101, 1111-12 (3d Cir. 1997) (finding that a decision-maker's

statement, "If you are getting too old for the job, maybe you should hire one or two young

bankers," four or five months before his decision to discharge the plaintiff was too remote in

time to establish pretext and because the comment pertained to hiring other employees to

assist the plaintiff, not whether the plaintiff himself should be retained or fired); *Antol v.*

*Perry*, 82 F.3d 1291, 1301 (3d Cir. 1996) ("Evidence that an individual involved in the

---

[26] Robert and Michael Dudash are brothers. (Doc. 37, Ex. J, EEOC Order Entering Judgment and Decision, at 6:4-7).

35

selection process, such as the decisionmaker's supervisor, referred to Antol as 'spasm head' often enough for Antol to state that he had become accustomed to it, supports an inference of discrimination.").

Although the Court agrees that this statement is too remote in time or context to support Plaintiff's claim of pretext, it is relevant and could be considered by a jury:

> the comment may be entitled to some weight when considered by the jury, although standing on its own it would likely be insufficient to demonstrate [prohibited] animus. In other words, the comment is not irrelevant, especially when coupled with [plaintiff's] other evidence of discrimination.

*Antol*, 82 F.3d at 1302 (citing *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 502 (3d Cir. 1995)).

### iii. Hostile Work Environment

To prevail on a hostile work environment claim, Plaintiff must prove that he 1) "suffered intentional discrimination because of his [protected EEOC activity], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected [him], 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel*, 706 F.3d at 167. "Title VII prohibits . . . harassment that is 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Id.* (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).

> To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23,

114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); *see also Caver v. City of Trenton,* 420 F.3d 243, 262–63 (3d Cir. 2005) ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

*Id.* at 168. "In evaluating a hostile work environment claim under . . . Title VII. . . , we are mindful that 'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver,* 420 F.3d at 262 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). "Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment. . . .'" *Id.* (internal citations omitted).[27] "The advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment in evaluating a hostile work environment claim." *Caver,* 420 F.3d at 264 (internal citations and quotation marks omitted).

Defendant concedes that Plaintiff has established the third and fifth prongs because Plaintiff complains that his direct supervisor, William Sparvieri, publicly cursed at and chastised him and gave him a "minimally satisfactory" job performance rating. (Doc. 38, at

---

[27] To the extent that Gazdick argues that Kuzar's comment to Michael Dudash in 2003 should factor into the Court's analysis of Gazdick's hostile work environment claim, the comment is insufficient to create a hostile work environment.

> Furthermore, comments referring to other individuals that were merely overheard by Davis are the sorts of "offhanded comments and isolated incidents" that the Supreme Court in *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275, cautioned should not be considered severe or pervasive enough to constitute a hostile work environment. *Cf. Heitzman,* 728 A.2d at 304-305 ("[A] derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member.").

*Caver,* 420 F.3d at 263.

22, n.7). Defendant contends, however, that Plaintiff has not established a *prima facie* case of hostile work environment because he has failed the other three prongs of the test.

For the purposes of her motion, Defendant accepts as true Plaintiff's allegations that Sparvieri cursed at him and chastised him in front of other employees. Defendant argues, though, that Plaintiff has failed to establish a causal link between his protected EEOC activity and Sparvieri's actions against him "*following* his reassignment" to the Pottsville field office. (*Id.* at 23). Plaintiff argues that the retaliatory hostile work environment began *when* he was reassigned to the Pottsville field office and denied relocation benefits. (Doc. 46 at 25-26). Defendant objects to this argument and characterizes it as an attempt to amend Plaintiff's hostile work environment claim by way of a brief. (Doc. 51, at 27, n.12).[28] Plaintiff counters that this argument is not an amendment of his claims because the Complaint sets forth these factual allegations in support of a hostile work environment claim. (Doc. 54, at 13-14; *see also* Compl. ¶¶ 27-38). Though Defendant's position has merit considering Plaintiff's admissions in his deposition (*see* n.8), the Court will include Plaintiff's involuntary transfer as part of a pattern of an ongoing and retaliatory hostile work environment perpetuated by Sparvieri.[29] Nevertheless, Plaintiff must establish that these events were causally related to his protected EEOC activity.

---

[28] Plaintiff agreed to Defendant's Statement of Material Fact ¶ 186 which stated that the harassing behavior from Sparvieri began after Plaintiff's transfer.

[29] ALJ Gallagher's analysis of Plaintiff's hostile work environment claim also encompassed Plaintiff's reduction of duties and involuntary transfer. (Doc. 37, Ex. J, at 31:7-21).

Plaintiff engaged in protected EEOC activity in March 2005. In September 2006, Plaintiff was reassigned to Pottsville as the field office supervisor and denied relocation benefits. Gazdick testified that Sparvieri's verbal abuse began when he "was reassigned to the Pottsville field office and he was my immediate supervisor." Even though they were in different locations, Sparvieri in Wilkes-Barre and Gazdick in Pottsville, Gazdick testified that he would communicate with Sparvieri "[s]everal times a day" by phone and e-mail, but "[m]ostly telephone." Gazdick would see Sparvieri in person in Pottsville "[s]everal times a month," and the secretary, Marie Beltz, sometimes heard the conversations between Sparvieri and Gazdick whether they were by phone or in-person. In the fifteen months that followed, Sparvieri often cursed at and chastised Plaintiff in front of other employees, scrutinized his work more harshly than others, and gave him a minimally satisfactory job performance rating in October 2007. Sparvieri's pattern of behavior continued until Plaintiff took sick leave in December 2007.

Plaintiff testified that Sparvieri used "[v]ulgar, violent language. Constantly making accusations of Mike Dudash doing things. And if I explained to him that it was justified, he'd fly off the handle cursing, yelling. Threatening me that if I don't do what he believes should be done, I'll be dealt with." Gazdick also stated that Sparvieri would "carry[] on that I did this wrong and I was supposed to do this and cursing and carrying on" in front of other employees. In addition, Sparvieri "would nitpick [Gazdick's] inspection and find fault with

things that were normal course of operations for all the supervisors in the district. And [Gazdick] was the only one that was chastised for it."

Sparvieri rated Gazdick "minimally satisfactory" for the appraisal period of October 1, 2006 through September 30, 2007.[30] The evaluation showed that Gazdick needed improvement in the areas of Resource Management and Coalition Building and Communication. Gazdick testified that the poor rating from Sparvieri was because of the way Gazdick was supervising Michael Dudash. According to Gazdick, Sparvieri wanted Michael Dudash disciplined because Sparvieri "did not like Michael Dudash" and Michael Dudash filed several EEOC complaints.[31]

Even accepting all of these allegations as true, Plaintiff has not shown that Sparvieri's conduct was causally linked to Gazdick's protected EEOC activity. Gazdick testified that he engaged in protected EEOC activity in March 2005. He does allege that

---

[30] The possible ratings were Exemplary, Highly Effective, Effective, Minimally Satisfactory, and Unsatisfactory. (R. 544).

[31] Even if the Court were to construe Gazdick's testimony to mean that Sparvieri had expressed hostility to Michael Dudash because of Dudash's EEOC activity, that does not mean Sparvieri's animosity towards Gazdick was also because of Gazdick's protected EEOC activity. For instance, in *Caver*, the plaintiff asserted the following instances of harassment based on his race:

> (1) McKee's comment to Valdora during roll call that it was "okay to be in the KKK"; (2) Valdora and McKee's use of racial epithets when dealing with prisoners; and (3) the racist graffiti and flyers placed around the Department by unidentified individuals. He also claims that certain facially neutral conduct, such as being referred for unwanted psychiatric evaluations and being berated by Valdora and McKee during meetings, was aimed at harassing him because of his race.

*Caver*, 420 F.3d at 263. However, the Court noted that

> no racist comment, written or spoken, was ever directed at Davis himself. . . . As a threshold matter, Davis cannot meet the first element of the hostile work environment claim under Title VII . . . solely by pointing to comments that were directed at other individuals. Davis cannot show that the comments would not have been uttered or written but for *his* race if Davis was neither on the receiving end nor the subject of any comments.

*Id.* (emphasis in original).

immediately afterwards, his workload responsibilities were reduced, and he was excluded

from meetings. However, he did not complain about his reduced workload, and his

involuntary transfer and denial of relocation benefits did not occur until September 2006.[32]

Assuming that Plaintiff can overcome the eighteen-month gap between his protected activity

and his transfer, by his own words, Sparvieri's disparaging treatment of him *began when he*

*was transferred*. Therefore, if there was any hostile work environment, it did not begin until

Plaintiff's transfer. Assuming there was a causal link between Plaintiff's activity and his

transfer, Plaintiff has not shown that Sparvieri's "abuse" was causally related to Plaintiff's

protected activity. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710 (3d Cir. 1997)

(holding that (1) plaintiff had established a hostile work environment existed before she went

on sick leave because the evidence showed her male co-workers vandalized her property,

exposed their genitals to her, threatened to kill her, and her supervisors intentionally failed

to train her and gave her poor performance evaluations because of her lack of training, but

(2) a seven-month gap of sick leave between periods of work was sufficient to "dissipate"

effects of hostile work environment upon her return).

Sparvieri never referred to Gazdick's decision not to testify in favor of the MSHA

when he cursed at or chastised Plaintiff. Instead, his stated reasons for being upset were

Gazdick's poor supervision of the inspectors in the Pottsville field office, especially Michael

Dudash. "To discredit the employer's proffered reason, . . . the plaintiff cannot simply show

---

[32] Plaintiff argues that his involuntary transfer was the "first opportunity" that Kuzar and Sparvieri had to get rid of him. (Doc. 46 at 20). The record is silent on the matter whether there were any other positions that Kuzar and Sparvieri could have transferred Plaintiff to before sending him to Pottsville.

that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

Sparvieri cited at least three instances in which Plaintiff had allegedly failed to meet his obligations as a field office supervisor. For example, on one occasion, Michael Dudash had stated in a report that a mine was in non-producing status when it was, in fact, producing. (R. 557-558, B&B Coal Co. inspection form, R. 314, Sparvieri EEOC testimony, 235:1-13). However, when Sparvieri looked into the matter, he believed that Dudash had not performed the inspection properly and that mine workers had been breathing in contaminated air. (R. 319-21, Sparvieri EEOC testimony, 240:10-242:11). Plaintiff argues that Sparvieri was mistaken and that he, Plaintiff, did properly supervise Dudash's inspections. According to Plaintiff, the contaminated air did not occur until after Dudash had completed his inspection, so Plaintiff could not have been aware of it.[33] Whether or not Sparvieri was mistaken, if Sparvieri believed that MSHA regulations were being breached and mine workers were exposed to dangerous mine conditions, he would be well within his rights to note such deficiencies in employees' performance evaluations.

---

[33] (*See* Doc. 43, Ex. D, Gazdick EEOC testimony, 2/20/09, at 92:16-93:23). Gazdick also contends that "[a]ttempts were made" to a certain Mr. Bender "to say statements that weren't true" for the purpose of "[d]iscrediting myself and Mr. Dudash." (*Id.* at 96:5-13). Whether or not Gazdick's contention that someone attempted to influence Bender to discredit him is true, the Court notes that Sparvieri did not rate Gazdick as Unsatisfactory, Plaintiff has not argued that Sparvieri's rating was beyond the regular evaluative process, and under the totality of the circumstances, when combined with the rest of Plaintiff's allegations, a single evaluation of "minimally satisfactory" does not amount to a hostile work environment.

Furthermore, when Gazdick was asked if "anybody else . . . was subjected to the alleged verbal abuse," by Sparvieri, he identified Kenneth Hare, Coleman, and Blackburn, Michael Dudash, and Ron Pinchorski. Of these employees, Pinchorski, Michael Dudash, and Coleman filed EEOC complaints. Hare never filed an EEO complaint, though Hare did testify on behalf of Gazdick in February 2009. However, Sparvieri could not have known about the future testimony that Hare would give when he was verbally abusing Gazdick in 2007. Accepting Plaintiff's testimony as true, it appears that Sparvieri treated everyone the same as Plaintiff, regardless of whether they had engaged in protected EEO activity or not. *See Connell v. Nicholson*, 318 F. App'x 75, 77 (3d Cir. 2009) (affirming the district court's grant of summary judgment on a gender-based hostile work environment claim in favor of an employer where a female employee routinely threatened both her male and female co-workers with violence).[34] Therefore, even though Sparvieri had a facially neutral reason for berating Plaintiff and giving him a rating of "minimally satisfactory" in October 2007, it does not appear from the record that his treatment of Plaintiff was because of Plaintiff's protected EEOC activity in March 2005.

Even assuming that Sparvieri's conduct was, indeed, causally linked to Gazdick's protected EEOC activity, it did not rise to a severe or pervasive level. The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 787-88 (noting that standards for judging

---

[34] " 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Id.* at 77 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)).

43

hostility under Title VII will "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language. . . ." and that Title VII is not violated by the "mere utterance of an . . . epithet which engenders offensive feelings by an employee" or by mere "discourtesy or rudeness," unless so severe as to constitute an objective change in the conditions of employment.) (internal quotations omitted); see also Williams v. Pennsylvania State Police Bureau of Liquor Control Enforcement, 108 F. Supp. 2d 460, 468 (E.D. Pa. 2000) (finding that "the most one could conclude is that over the past five years, plaintiff received poor performance evaluations, was the subject of three BPR complaints (only one of which resulted in any disciplinary action), and had interpersonal conflicts with her supervisors and co-workers," all of which did not amount to a hostile work environment).

Sparvieri was located in the Wilkes-Barre office, and Plaintiff was located in Pottsville. Therefore, most of Plaintiff's contact with Sparvieri was by phone. They spoke "several times a day," and on occasion, Sparvieri would visit the Pottsville office to evaluate Plaintiff. It was on these occasions that Sparvieri would sharply criticize Plaintiff publicly for his supervision of inspectors, including Michael Dudash and others. Setting aside for the moment that Sparvieri and Plaintiff did not work in the same office after Plaintiff's transfer, several phone calls a day (during an unknown period of days), occasional public criticisms, and a single evaluation of "minimally satisfactory" (with no apparent disciplinary consequences) from Sparvieri do not amount to a hostile work environment. While the

Court does not condone supervisors cursing at their employees and humiliating them in front of their co-workers, Sparvieri's conduct was not so severe or pervasive as to establish a hostile work environment.[35]

Finally, Gazdick testified that Sparvieri's conduct interfered with Gazdick's work because "[i]t didn't put [him] in the right frame of mind to want to even do [the] job." He elaborated by saying he "did not have the frame of mind to do [his] job" because he was "going to get abused. And it was one of [the] factors in deciding to retire." When asked whether he was still able to perform his job duties despite Sparvieri's scrutiny of his work, being chastised and reprimanded in front of other employees, and being rated negatively on a performance evaluation, Gazdick responded, "Yes." Gazdick also conceded that he neither objected to any of the conduct he claims supports his hostile work environment claim nor reported such conduct to anyone at MSHA.

Thus, construing the facts in Plaintiff's favor, the Court finds that Sparvieri's conduct did not give rise to a severe or pervasive hostile work environment. As such, Plaintiff also could not recover on a claim for constructive discharge. *See Mandel*, 706 F.3d at 169. Therefore, the Court will grant summary judgment on Plaintiff's claims for hostile work environment and constructive discharge.

---

[35] This case differs from those in which courts have found that the plaintiff did establish a hostile work environment claim. *See, e.g., Spain v. Gallegos*, 26 F.3d 439 (3d Cir. 1994) (finding that plaintiff had established a *prima facie* case of hostile work environment because she had shown that her male supervisor demanded loans from her over a period of several years, that their private meetings had caused rumors to abound that she and her supervisor were in an improper sexual relationship, these rumors directly led to her co-workers ostracizing her and her other supervisors to give her poor evaluations, and these poor evaluations partially caused her to lose opportunities for promotion).

## IV. **Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 35) will be granted in part and denied in part. Excepting Plaintiff's claim for retaliation in the form of a reduced workload and involuntary transfer to the Pottsville field office after he engaged in protected EEOC activity, Defendant's motion will be granted in all respects. Plaintiff's claims for retaliation in the form denial of relocation benefits and incentives, denials of three positions in Wilkes-Barre, hostile work environment, and constructive discharge will be dismissed. A separate Order follows.

Robert D. Mariani
United States District Judge